## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dale William Johnson **Civil No. 11-cv-1268 (JRT/SER)**

       Plaintiff,

v. **REPORT AND**
**RECOMMENDATION**

Commissioner of Social Security,

       Defendant.

---

John H. Burns, Esq., 317 Northwest Seventh Street #2, Willmar, Minnesota 56201, on behalf of Plaintiff.

David W. Fuller, Esq., Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

---

STEVEN E. RAU, United States Magistrate Judge.

Pursuant to 42 U.S.C. § 405(g), Plaintiff Dale William Johnson ("Johnson") seeks review of the Commissioner of Social Security's ("Commissioner") denial of Johnson's application for Social Security Disability Insurance ("SSDI") and Social Security Income ("SSI"). This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The parties filed cross-motions for summary judgment [Doc. Nos. 11 and 17]. For the reasons set forth, the Court recommends Johnson's motion for summary judgment be denied and the Commissioner's motion be granted.

## I.      BACKGROUND

### A.      Procedural History

Johnson applied for SSDI and SSI on November 9, 2007.  (Admin. R. at 108–28, 134) [Doc. No. 9].  In both applications, he alleged a disability onset date of July 23, 2007.  (*Id.* at 108, 112, 134).  Johnson claimed disability due to the following impairments: (1) type II diabetes mellitus,[1] (2) a history of partial lung resection, (3) tendinopathy of the right shoulder,[2] (4) hyperlipidemia,[3] (5) morbid obesity,[4] (6) hypertension, (7) coronary artery disease, (8) degenerative joint disease of the hip, (9) lower extremity edema,[5] (10) progressive exertional dyspnea,[6] (11) congestive heart failure, (12) heart wall ischemia secondary to previous myocardial infarction,[7] (13) restrictive ventilatory defect,[8] (14) stenosis of the coronary arteries,[9]

---

[1]      Type II diabetes mellitus is a chronic metabolic disorder in which utilization of carbohydrate is impaired and that of lipid and protein enhanced.  It is caused by a relative deficiency of insulin and is characterized, in more severe cases, by chronic hyperglycemia, glycosuria, water and electrolyte loss, ketoacidosis, and coma.  *Stedman's Medical Dictionary*, Diabetes Mellitus, (27th Ed. 2000).

[2]      Tendinopathy refers to both inflammation and microtears in tendons.  Tendon Injury (Tendinopathy) – Topic Overview, http://firstaid.webmd.com/tc/tendon-injury-tendinopathy-topic-overview (last visited June 5, 2012).

[3]      Hyperlipidemia is the presence of an abnormally high concentration of lipids in the circulating blood.  *Stedman's Medical Dictionary*, Hyperlipidemia, (27th Ed. 2000).

[4]      Morbid obesity is an excess of fat in proportion to lean body mass that is sufficient to prevent normal activity or physiologic function, or to cause the onset of a pathologic condition.  *Stedman's Medical Dictionary*, Morbid Obesity, (27th Ed. 2000).

[5]      Edema is an accumulation of an excessive amount of watery fluid in cells or intercellular tissues.  *Stedman's Medical Dictionary*, Edema, (27th Ed. 2000).

[6]      Exertional dyspnea is excessive shortness of breath after exercise.  *Stedman's Medical Dictionary*, Exertional Dyspnea, (27th Ed. 2000).

[7]      Ischemia is inadequate circulation of blood, usually as a result of some mechanical obstruction of the blood supply, often the result of coronary artery disease.  *Stedman's Medical Dictionary*, Ischemia, (27th Ed. 2000).

[8]      Restrictive ventilatory defect is the name given to a category of disease that are characterized by a reduction in lung volume.  Airflow, Lung Volumes, and Flow-Volume Loop, Merck Manual (May 2009) http://www.merckmanuals.com/professional/pulmonary _disorders/tests_of_pulmonary_function_pft/airflow_lung_volumes_and_flow-volume_loop .html#v912807.

(15) early Dupuytren's contracture of the right hand,[10] (16) adhesive capsulitis in the right shoulder,[11] (17) bilateral knee pain, (18) asthma, (19) vertigo, (20) bilateral degenerative disease of the shoulders, (21) obstructive sleep apnea,[12] (22) leg rash, (23) depression, and (24) situational anxiety.[13]   These impairments allegedly prevented Johnson from obtaining gainful employment.  (*Id.* at 138).

Johnson's applications were denied initially on January 9, 2008, and again upon reconsideration on June 20, 2008.[14]   (*Id.* at 66–77, 80–87).   Following a request from Johnson, Administrative Law Judge David K. Gatto ("the ALJ") heard the matter.   (*Id.* at 7–9, 24–29, 30–39, 41–65, 95, 96–99, 104, 106).   After the ALJ issued an unfavorable decision, the Appeals Council denied Johnson's request for a review of that decision.   (*Id.* at 1–6, 10–12, 13–19).   The

---

[9]      Stenosis is the abnormal narrowing of any canal or orifice.   *Stedman's Medical Dictionary*, Stenosis, (27th Ed. 2000).

[10]      Dupuytren contracture is a disease of the palmar fascia resulting in thickening and shortening of fibrous bands on the palmar surface of the hand and fingers resulting in a characteristic deformity of the fourth and fifth digits.  *Stedman's Medical Dictionary*, Dupuytren Contracture, (27th Ed. 2000).

[11]      Adhesive capsulitis is a condition in which there is a limitation of motion in a joint due to inflammatory thickening of the capsule, a common cause of stiffness in the shoulder.  *Stedman's Medical Dictionary*, Adhesive Capsulitis, (27th Ed. 2000).

[12]      Sleep apnea is a disorder characterized by recurrent interruptions of breathing during sleep due to temporary obstruction of the airway by lax, excessively bulky, or malformed throat tissues, which results in lower than normal oxygenation of the blood and chronic lethargy. *Stedman's Medical Dictionary*, Obstructive Sleep Apnea, (27th Ed. 2000).

[13]      This list is based on the Johnson's applications, the ALJ's findings, the hearing transcript, and Johnson's Memorandum in Support of Motion for Summary Judgment.   Johnson's applications claimed disability due to the following impairments: "diabetes, heart disease, asthma, bad hip left, bad knee both, bad shoulder  right, heart bypass, lung diesease [sic], skin diesease [sic] I have very limited range of motion in my right arm.  I am limited on the amount that I can walk.  I am diabetic and asthmatic and this affects my bodies [sic] coping with the changes in temperature and humidity.  Heart disease limited shoulder movement bad hip[ ]bad knees."  (Admin. R.) [Doc. No. 9 at 138].

[14]      Johnson's request for reconsideration was filed about thirty days after the due date.  (*Id.* at 72–73, 79).  Pursuant to the Social Security Administration's direction, Johnson filed a statement of good cause for his untimely filing and explained that he "has a difficult time understanding what [he] read" and a friend who usually "helps [him] with things like this" was unavailable.  (*Id.* at 79).

denial of further review rendered the ALJ's decision final.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005); 20 C.F.R. § 404.981.   Johnson seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

### B.      Plaintiff's Testimony

As of the date of the hearing, Johnson was a sixty-one-year-old man.[15]  (*Id.* at 43).   He is 5'6" and weighs approximately 281 pounds.  (*Id.* at 54, 137).   His knees hurt when he stands because of his body weight, and he has been "on the heavy side" his entire life.  (*Id.* at 54).  Upon high school graduation, he was 167 pounds; by age twenty-three, he weighed about 250 pounds.  (*Id.*).   After 2005, Johnson's income tax returns reflect only a few thousand dollars in net income and Johnson testified there have been some years of no income or negative income. (*Id.* at 55–56).   He receives food stamps, general welfare assistance, and energy assistance.  (*Id.* at 55).

Johnson attended vocational school where he studied architectural drawing for two years and took a construction course that provided him with skills related to carpentry.  (*Id.* at 44).   He is a fifth-generation carpenter who began working with his father at the age of twelve and continued to work "to a limited extent" on the date of the hearing.  (*Id.* at 44, 46).   Johnson also works as a general contractor.  (*Id.* at 46).   He started working as a self-employed general contractor in 1975.  (*Id.* at 46, 47).   In previous years, Johnson's company had as many as eight employees.  (*Id.* at 49).   At the time of the hearing, however, the company consisted of only Johnson and his son, who began to work with him in 1991.  (*Id.* at 47, 49).   A "very part-time[]" employee comes into help, but only when heavy lifting is involved.  (*Id.* at 49).

---

[15]      In addition to Johnson's testimony, this background information was provided in part by Johnson's attorney, John Burns, during his opening statement at the hearing.  (*Id.* at 43–46).

In his "younger years," Johnson worked forty to fifty hours per week building walls, laying plywood, laying siding, shingling, hanging rafters, placing windows and doors, and other construction site projects.  (*Id.* at 51).  He was able to go up and down a ladder carrying an eighty-five-pound bundle of shingles on his shoulder.  (*Id.* at 52).  Then, Johnson had a heart attack in 1996 and a quadruple bypass surgery in 1998.  (*Id.* at 44).  After his heart attack, Johnson's ability to work declined and he began to "slow down."  (*Id.* at 47, 50).  Nevertheless, Johnson continued to work eight hours per day as a carpenter—carrying his tool pouch, climbing ladders, helping with pneumatic nailers, and assisting in hanging shingles.  (*Id.* at 48, 56–57).  During the evening, he worked about two hours at home doing the work of a contractor: creating bids, estimating, preparing the next day's materials, and listing materials needed.  (*Id.* at 57).  By Johnson's estimate, he worked approximately ninety-five percent of the time as a carpenter and five percent of his time as a contractor.  (*Id.*).

Sometime in July 2007, Johnson went to work early in the morning on a warm, humid day and became lightheaded.  (*Id.* at 46).  He found that he was unable to work and took the day off.  (*Id.* at 46–47).  Around that time, his asthma became much worse and he began to have rotator cuff problems in his left shoulder.  (*Id.* at 48).  Johnson began to develop rotator cuff problems in his right shoulder in early 2008.  (*Id.*).  Despite right shoulder surgery, Johnson testified that it never "really came back to normal."  (*Id.*).

Johnson works "about a couple of hours a day" before he fatigues.  (*Id.* at 44, 49).  Given his limited capacity to work, his role in the business has become that of a handyman.  (*Id.* at 48–49).  He goes to the jobsites with his son and helps where he can with "lighter duties" on the ground—cutting siding and plywood, carrying light materials to the site, picking up materials, and retrieving small tools—but, he sits "in a chair breathing heavily" approximately six-and-a-

half hours out of eight. (*Id.* at 49–50, 57–58). When he does work, he does not wear his tool pouch because it is too heavy for him and causes early morning fatigue. (*Id.* at 48). Instead, he puts his hammer in his back pocket and his tape measure on his belt. (*Id.*).

Johnson testified that it is not possible physically for him to complete jobs on his own. (*Id.* at 58). Typically, he does not use a ladder; if he must use one, he climbs cautiously. (*Id.* at 52–53). He does not work on roofs anymore either because a problem in his left ankle prohibits walking on angles. (*Id.* at 53). He becomes dizzy when tilting his head back for overhead work. (*Id.*). He can lift only ten to fifteen pounds. (*Id.* at 59). Cysts in his hand require a light grip and he can only hammer for ten to fifteen minutes. (*Id.* at 60). Rotator cuff problems in both shoulders prevent overhead lifting. (*Id.* at 53, 60). He can stand for ten to fifteen minutes if he is in motion or is leaning against something, but he cannot lean and work. (*Id.* at 59). If he is standing still, his back starts to "give [him] a lot of problems" after a couple minutes. (*Id.*). Standing for more than four out of eight hours is not possible. (*Id.*). He can only sit for fifteen to twenty minutes before he becomes agitated because of pain he attributes to four cracks in his tailbone and pressure on his kneecaps. (*Id.* at 59–60). If on his knees, Johnson is unable to get back up on his own usually. (*Id.* at 53–54). In addition, his problems, particularly his asthma and diabetes, are affected "tremendously" by the environment. (*Id.* at 58). Humidity makes breathing difficult. (*Id.*). When the temperature is above 80 degrees Fahrenheit, he cannot go outside; and when it is below 40 degrees Fahrenheit, his fingers turn pink and purple because of poor circulation in his extremities. (*Id.*).

C.      **Medical Evidence**

1.              **Medical Records Predating Disability Onset Date**

On March 8, 2004, Johnson saw Dr. Fredrick W. Hund ("Dr. Hund") for his diabetes. (*Id.* at 493–94).  Johnson had no complaints or concerns other than continued pain from heel spurs.  (*Id.* at 493–94, 527, 530).  Dr. Hund noted that Johnson's heel spurs showed some signs of early diabetic neuropathy.  (*Id.* at 493–94).  Dr. Hund also commented that Johnson was not controlling his diabetes very well because he was not checking his blood sugar regularly and gaining weight.  (*Id.*).  Johnson told Dr. Hund that exercise was challenging for him and he could do about fifteen minutes on a treadmill.  (*Id.*).  He also told Dr. Hund that he was not regularly wearing his CPAP mask for his sleep apnea because "of difficulties with the fit."[16]  (*Id.*).  A physical examination failed to reveal anything remarkable.  (*Id.*).

Three weeks later, Johnson saw Dr. Hund and told him that he passed out twice in the previous week and experienced a total of six "passing out" episodes.  (*Id.* at 491).  After examination, Dr. Hund concluded that Johnson's "passing out" episodes were feelings of intense vertigo and disequilibrium, but there was no loss of consciousness.  (*Id.*).  Dr. Hund found that Johnson's neurological symptoms were all otherwise "unremarkable, negative, or normal."  (*Id.*).  Dr. Hund also reviewed Johnson's blood sugar log and thought his diabetes seemed to be "improving."  (*Id.*).

---

[16]      A continuous positive airway pressure mask ("CPAP mask") provides a steady flow of room air at low pressure through the nose to overcome intermittent upper respiratory obstruction and is an effective treatment for sleep apnea.  *Stedman's Medical Dictionary*, Obstructive Sleep Apnea, (27th Ed. 2000).

On June 10, 2004, pulmonologist Dr. Salim A. Kathawalla ("Dr. Kathawalla") saw Johnson for complaints of pulmonary sarcoidosis[17] and obstructive sleep apnea. (*Id.* at 525–26). Johnson's symptoms, minimal shortness of breath and an occasional cough, were unchanged. (*Id.*). Johnson continued to use a CPAP mask, but removed it after three or four hours. (*Id.*). A CT of his chest showed that his condition was stable. (*Id.*). Dr. Kathawalla noted tiny pulmonary nodules and minimal to mild obstructive pulmonary impairment, but found Johnson's pulmonary sarcoidosis had been stabilized for years and remained stable. (*Id.*). Johnson complained of fatigue, that Dr. Kathawalla attributed to sleep apnea and encouraged use of the CPAP mask. (*Id.*). Dr. Kathawalla also concluded Johnson's hypertension was stable and that he recovered well from coronary artery bypass graft surgery. (*Id.*). Johnson was overweight at 248 pounds, but his lungs were clear and a cardiology test was normal. (*Id.*).

On July 21, 2004, Johnson followed up with Dr. Hund for his diabetes, atherosclerotic cardiovascular disease, and vertigo.[18] (*Id.* at 490). Johnson's blood sugars were "running fairly well" and Dr. Hund opined that Johnson had "very good control" over his diabetes. (*Id.*). Johnson remained obese, notwithstanding his reports that he did "not eat much at all." (*Id.*). Dr. Hund found Johnson's heart and lungs were normal on examination and that he had "good control" over his hypercholesterolemia and hypertension. (*Id.*). Dr. Hund concluded that the position of Johnson's head and neck caused his dizziness. (*Id.*).

---

[17]    Pulmonary sarcoidosis is a disease that causes small lumps on the lungs and creates loss of lung volume and abnormal lung stiffness. *Stedman's Medical Dictionary*, Pulmonary Sarcoidosis, (27th Ed. 2000).
[18]    Atherosclerosis is the hardening and narrowing of the arteries and is usually the cause of cardiovascular disease. *Stedman's Medical Dictionary*, Atherosclerosis, (27th Ed. 2000).

The following month, Johnson saw ear, nose, and throat specialist Dr. Gulstan K. Sahni ("Dr. Sahni") for dizziness. (*Id.* at 504). He told Dr. Sahni that for the preceding six or seven weeks he became dizzy when he looked up or bent down. (*Id.*). Dr. Sahni diagnosed him with dizziness secondary to benign positional vertigo and explained to Johnson that when he turned his head, he twisted an artery in his neck, causing circulation problems. (*Id.* at 505). Dr. Sahni also suggested that "diabetes may be a contributing factor." (*Id.*).

On January 24, 2005, Johnson followed up with Dr. Hund for his diabetes, hypertension, and hypercholesterolmia. (*Id.* at 488). Johnson said he was "feeling well" and had no shortness of breath, chest discomfort, or any symptoms to suggest recurrence of his atherosclerotic heart disease. (*Id.*). Dr. Hund found that Johnson's hypertension was "doing well," his hypercholesterolemia was "'good', although not 'yet perfect,'" but his diabetes was "poorly controlled." (*Id.*). Johnson admitted he was not checking his blood sugars regularly, and Dr. Hund reviewed the importance of blood sugar to Johnson's condition, increased his insulin dosage, and instructed Johnson to check his blood sugar regularly and keep a record of the results to bring to his next appointment. (*Id.*). Johnson complained of pain in his left upper arm between his elbow and shoulder, explaining that it had been there for several months. (*Id.*). He also reported that his range of motion with that arm was so limited that he was unable to reach the back of his head. (*Id.*). Dr. Hund concluded adhesive capulistis and impingement syndrome caused Johnson's symptoms and arranged a physical therapy appointment for Johnson. (*Id.*).

On March 9, 2005, Johnson saw Dr. Hund again for his diabetes and concerns about his shoulder. (*Id.* at 487). Physical examination of his lungs and heart produced normal results. (*Id.*). Johnson told Dr. Hund that he tested his blood sugars more often and they were "better." (*Id.*). Dr. Hund noted that "[h]is last A1C was certainly less than optimal" and instructed

Johnson to return in a month to repeat the test. [19]   (*Id.*).   The range of motion in Johnson's left shoulder was "better," but still not "good."   (*Id.*).   Dr. Hund opined Johnson had a "probable tendon tear" and scheduled an orthopedic consultation.   (*Id.*).

Later that month, Johnson saw orthopedic surgeon Dr. Paul C. Iverson ("Dr. Iverson") for an evaluation of his shoulder pain.   (*Id.* at 522).   An MRI revealed labral tears, but Johnson had no symptoms of instability or complaints consistent with a labral tear.[20]   (*Id.*).   Dr. Iverson noted that Johnson had "a longitudinal tear in the long head of the biceps which quite frankly I have not heard of before, but certainly can exist."   (*Id.*)   He determined, however, that "nothing need be done with that."   (*Id.*).   Although Dr. Iverson found no complete rotator cuff tears, he did find tendionsis[21] and positive impingement signs[22] and treated both with a steroid injection.   (*Id.*).

On April 15, 2005, Johnson followed up with Dr. Hund for his hypertension.   (*Id.* at 486).   Dr. Hund noted that Johnson was "doing better" with his hypertension and had "improved control" after he recently started taking hydrochlorothiazide.[23]   (*Id.*).   A physical examination of his lungs and heart produced normal results.   (*Id.*).   Johnson reported that "he just fe[lt] better," but still complained of problems with his shoulder.   (*Id.*).   About two weeks later, Johnson saw Dr. Iverson again regarding his shoulder.   (*Id.* at 521).   Dr. Iverson noted that Johnson "really did

---

[19]     An A1C test measures the average blood sugar level for the past two to three months. The higher the results, the poorer the patient's blood sugar control.   <u>A1C test</u>, Mayo Clinic (Jan. 21, 2011), http://www.mayoclinic.com/health/a1c-test/MY00142.

[20]     A labral tear is a tear in the cartilage that surrounds the shoulder socket to help create stability.   *Stedman's Medical Dictionary*, Labrum, (27th Ed. 2000).

[21]     Tendinosis refers to tiny tears in the tissue in and around the tendon caused by overuse. Tendon Injury (Tendinopathy) – Topic Overview, http://firstaid.webmd.com/tc/tendon-injury-tendinopathy-topic-overview (last visited June 5, 2012).

[22]     Positive impingement signs are demonstrated in patients with rotator cuff tendonitis or tendinosis within the subacromial space by pain elicited in physical examination.   *Stedman's Medical Dictionary*, Impingement Sign, (27th Ed. 2000).

[23]     Hydrochlorothiazide is an oral diuretic and antihypertensive medication.   *Stedman's Medical Dictionary*, Hydrochlorothiazide, (27th Ed. 2000).

not make much progress in Physical Therapy," but he did find short-term relief with the steroid injection. (*Id.*). Dr. Iverson agreed with the recommendation from physical therapy for a shoulder manipulation under anesthesia to break up the adhesions and scheduled the procedure for May 9, with physical therapy to resume the following day.[24] (*Id.*).

Just over five months later, Johnson followed up with Dr. Hund regarding his diabetes. (*Id.* at 484–85). His labs were "not ideal," but "pretty good" according to Dr. Hund. (*Id.*). Dr. Hund and Johnson discussed Johnson's high risk for heart attack given his conditions and agreed to test his blood sugars more frequently. (*Id.*). Johnson revealed that he had stopped taking his morning insulin, but pledged to be more diligent about controlling his diabetes. (*Id.*). Dr. Hund found mild bilateral ankle edema, but described it as "really very mild." (*Id.*). His cholesterol numbers were "quite satisfactory" and his blood pressure was "quite good." (*Id.*). An examination of his heart and lungs was unremarkable. (*Id.*). Johnson lost about fifteen pounds, but he expressed frustration that his weight loss plateaued. (*Id.*). In response to Johnson's inquiries, Dr. Hund reviewed Johnson's insurance and found liposuction or other surgery was not covered. (*Id.*).

Between January and February 2006, Johnson visited registered nurse Jonelle Heinen ("Heinen") of the Rice Diabetes and Nutrition Center at Rice Memorial Hospital three times. (*Id.* at 451, 452–53, 454–55). His blood sugars improved gradually over the course of his visits. (*Id.* at 451, 452–53). Heinen noted that Johnson did a "very good job" counting carbohydrates, but needed a review of nutrition information. (*Id.* at 454–55). She increased his insulin doses and placed him on a meal plan designed to promote weight loss and support heart health. (*Id.* at

---

[24]     Shoulder manipulation surgery is a procedure performed under general anesthetic in which a doctor moves the shoulder joint in different directions to help loosen the tightened tissue and adhesions. Frozen shoulder, Mayo Clinic (Apr. 28, 2011), http://www.mayoclinic.com/health/frozen-shoulder/DS00416/DSECTION=treatments-and-drugs.

449–450, 451, 452–53, 454–55).   Heinen noted that "if [Johnson] is actually eating what he writes on paper," his fruit and vegetable intake increased dramatically in early February.   (*Id.* at 451).  He returned to the Rice Diabetes and Nutrition Center on April 13, 2006.  (*Id.* at 449–50).  Heinen found Johnson's food records did not correlate with his four-pound weight gain and suspected he was eating more than he reported.  (*Id.*).  She also observed that he failed to take the increased insulin dosage prescribed.  (*Id.*).  Heinen encouraged Johnson to exercise and offered to arrange a meeting with an exercise pathologist, but Johnson said he was not interested because of work.  (*Id.*).

Johnson saw dermatologist Dr. Julie Schultz ("Dr. Schultz") twice, on April 19, 2006 and May 3, 2006, about a leg rash.  (*Id.* at 498, 499–500).  Johnson went to the emergency room in December 2005 when the rash started initially as weeping, red wounds on both legs. (*Id.* at 452–53).  He was placed on antibiotics at that time and the areas improved, but then became worse.  (*Id.* at 452–53, 499–500).  Dr. Schultz prescribed the use of a topical corticosteroid, hydroxyzine, and a medicated wash, and Johnson's symptoms improved within three weeks.  (*Id.* at 498, 499–500).

In April 2007, Johnson received a prescription for therapeutic shoes because of diabetes-related pre-ulcerative callus and foot deformity.  (*Id.* at 323, 467).  On June 15, 2007, Johnson saw Dr. J.R. Kemp ("Dr. Kemp") for his diabetes, a rash, and problems with his right shoulder.  (*Id.* at 317–18, 482).  Dr. Kemp ordered several blood tests related to Johnson's diabetes, referred Johnson to dermatology for his rash, and encouraged the use of a Lidoderm patch to

relieve his shoulder pain.[25]   (*Id.*).   He also recommended that Johnson be seen for a complete physical.  (*Id.*).

### 2.     Medical Records Between the Onset Date and the ALJ's Decision

On July 30, 2007, Dr. Kemp performed a complete physical and found Johnson's blood sugar was not well controlled.  (*Id.* at 299–301, 310–12, 479–81).   Johnson denied chest pain, cough, new or different skin sores, but complained of right shoulder pain and hip problems. (*Id.*).    An MRI of Johnson's right shoulder revealed mild tendinopathy and rotator cuff impingement, but no evidence of a rotator cuff tear.  (*Id.* at 252, 307, 478).  On August 13, 2007, Johnson saw Dr. Kemp and complained of difficulty sleeping for the last six weeks, as well as continued problems with his shoulder.  (*Id.* at 252, 478).  Dr. Kemp referred Johnson to physical therapy for his shoulder and, at Johnson's request, completed a disability form.[26]  (*Id.*).

The next day, Johnson began physical therapy for his shoulder.  (*Id.* at 278–79).  He rated his pain at a five on a one-to-ten scale.  (*Id.*).  Physical therapist Craig Zempel ("Zempel") concluded Johnson had adhesive capuslitis, as well as symptoms of shoulder joint irritation and rotator cuff tendonitis.  (*Id.*).  Johnson received ultrasound therapy treatment and practiced exercises to increase his range of motion.  (*Id.*).  He returned to physical therapy eight times in the next month, but found little relief and continued to complain of difficulty sleeping because of shoulder pain.  (*Id.* at 266, 268, 269, 272, 273, 274, 275, 276, 277).

---

[25]     A Lidoderm patch is a method of administering lidocaine, a type of topical local anesthetic used to numb an area to relieve pain.  Lidocaine, Mayo Clinic (Nov. 1, 2011), http://www.mayoclinic.com/health/drug-information/DR602925
[26]     The record does not contain a copy of this disability form.

When physical therapy failed to improve his condition, Dr. Kemp provided a referral to orthopedic surgery for his right shoulder. (*Id.* at 265, 476). On September 19, 2007, he saw orthopedic surgeon Dr. Howard Sampson ("Dr. Sampson"). (*Id.* at 247, 263, 400). Dr. Sampson concluded Johnson's shoulder pain was likely adhesive capsulitis and recommended manipulation of the shoulder. (*Id.* at 247, 248, 263, 264, 400, 401). Dr. Sampson performed the procedure on October 2, 2007. (*Id.* at 231–42, 249, 251, 253, 381, 384–96, 402, 404, 468). The following day, Dr. Sampson noted "marked improvement" and provided a referral for physical therapy. (*Id.* at 228, 229, 378, 380).

Johnson saw Dr. Schultz on October 3, 2009 to follow up with her regarding his leg rash. (*Id.* at 227, 379, 497). She noted Johnson had "great improvement" to his legs with the use of the prescribed medication. (*Id.* at 497). She noted "minimal" edema on Johnson's legs and a "mild" amount of erythema along his right leg.[27] (*Id.* at 227, 379, 497). Dr. Schultz refilled his prescription and recommended annual checkups. (*Id.* at 227, 379, 497).

Johnson returned to physical therapy for his shoulder on October 4, 2007. (*Id.* at 226, 377). Over the next four weeks, Johnson went to physical therapy eight times. (*Id.* at 212, 213, 214, 216, 218, 219, 220, 221, 223, 224, 225, 360, 361, 362, 363, 364, 367, 368, 369, 370–71, 372, 373, 374, 523, 524). Two months after his shoulder surgery, Dr. Sampson concluded that he was "making progress" and formally discontinued physical therapy despite Johnson's continued range of motion problems. (*Id.* at 439, 519).

Two days later, Johnson saw Dr. Kemp complaining of right shoulder pain. (*Id.* at 436–37, 471–72). Johnson explained that he felt physical therapy was helping, but severe pain after his appointments caused him to become nauseous. (*Id.*). Dr. Kemp ordered another MRI of

---

[27]     Erythema is redness due to capillary dilation. *Stedman's Medical Dictionary*, Erythema, (27th Ed. 2000).

14

Johnson's shoulder to take place on November 29, 2007. (*Id.*). The results showed a "tiny" partial tear in his rotator cuff, but that his condition had not changed significantly since his last, pre-operative MRI. (*Id.* at 432, 433, 434).

On December 17, 2007, ten weeks after his shoulder surgery, Johnson returned to Dr. Sampson and reported he was doing his exercises and "starting to feel better." (*Id.* at 431). Dr. Sampson reviewed the recent MRI and, comparing it to the pre-operative MRI, opined that "they look fundamentally the same and I do not think we would call it very important." (*Id.*). Dr. Sampson thought Johnson would continue to improve if he performed his exercises. (*Id.*). He concluded that Johnson was "actually making good progress" and that physical therapy may have been pushing him too hard. (*Id.*).

On March 3, 2008, Johnson saw Dr. Kemp to follow up regarding his diabetes. (*Id.* at 430, 470). Dr. Kemp increased Johnson's insulin and ordered an A1C test and other labs. (*Id.*). A physical examination of Johnson's lungs and heart produced normal results. (*Id.*). Dr. Kemp observed "trace" edema in Johnson's ankles and feet. (*Id.*). He also noted Johnson was morbidly obese and "maximized on much of his medication" and recommended that Johnson consider gastric bypass surgery. (*Id.*). About six weeks later, Dr. Kemp refilled a prescription for therapeutic shoes. (*Id.* at 466).

At the Social Security Administration's request, Johnson completed a Function Report describing his daily activities in April 2008. (*Id.* at 171–78). He stated that he gets out of bed, takes his medication, eats a small breakfast, does fifteen to thirty minutes of exercise, cleans the dishes and house, eats lunch, visits with friends and family in the area, fixes his evening meal, takes his medications, and reads the paper or watches television before going to bed by 10:00 p.m. (*Id.* at 171). Johnson explained he had a friend living with him temporarily while she

15

looked for a place to live and that she helped around the house, but indicated he had no problem with personal care.  (*Id.* at 172).  He stated that he completed light household chores, but could not descend stairs or do outdoor housework.  (*Id.* at 173).  He said that he prepared his own meals and enjoyed cooking for others, drove, went out alone, did his own shopping, paid bills, handled his bank accounts, counted change, and cared for his dog and approximately thirty fish. (*Id.* at 172, 173, 174).  Johnson indicated there was no change in his ability to handle money with his impairments.  (*Id.* at 175).  He explained that he "enjoy[ed] many interests" and listed several hobbies, including coin collecting, hot tubing, reading, visiting with friends, watching sports on television, and collecting movies.  (*Id.* at 174).  Johnson regularly went to the shopping mall and visited friends often.  (*Id.* at 175).  He said that he has not been able to enjoy his hobbies as much, which led him to feel depressed and that he had "grown quiet in groups."  (*Id.* at 175, 176–77).  Finally, Johnson was capable of walking sixty to eighty yards before needing to stop and rest.  (*Id.* at 176).

On June 16, 2008, Johnson saw Dr. Kemp complaining of left hip and knee pain.  (*Id.* at 469).  Johnson requested renewal of his handicapped sticker because he experienced significant left hip pain when he walked more than twenty feet.  (*Id.*).  Dr. Kemp suggested osteoarthritis caused the pain.  (*Id.*).

On July 8, 2008, Johnson went to the emergency room following a burglary and assault at his home.  (*Id.* at 448).  He took Zoloft to help him cope with the stress of the burglary.  (*Id.* at 460).  Within five months, Johnson reported that he was "over any issues" from the burglary and requested to discontinue the Zoloft.  (*Id.* at 457).  In September, Johnson saw Dr. Kemp diabetes follow up.  (*Id.* at 460).  Dr. Kemp observed that his cholesterol profile was "excellent" and that Johnson was establishing care with a new doctor.  (*Id.*).

16

On November 6, 2008, he visited Dr. Robert M. Kaiser ("Dr. Kaiser") to establish primary care. (*Id.* at 458). He returned on January 8, 2009 and told Dr. Kaiser he was feeling "better and better." (*Id.* at 457). Johnson was exercising and had lost thirteen pounds. (*Id.*).

Four months later, Johnson saw Dr. Kaiser for a diabetes follow up and talked about a number of other complaints. (*Id.* at 533–35). First, Dr. Kaiser noted Johnson had not experienced problems with low blood sugars. (*Id.*). Dr. Kaiser did not recommend any adjustments to Johnson's diabetes medications, but stated Johnson "needed[ed] to continue his efforts [at] weight loss." (*Id.*). Johnson lost about twenty-five pounds, but his weight loss plateaued. (*Id.*). Dr. Kaiser also examined an "area of redness" on Johnson's right hip where he injects his insulin and provided antibiotics for the skin infection. (*Id.*). Second, he concluded the pain Johnson complained of in his left hip was caused by the carpenter pouch Johnson carried on that hip and noted that the "pain in his left hip keeps him from doing his job duties." (*Id.*). Third, Johnson complained that pain in his knees limited his ability to walk any distance, squat, or kneel, and recognized that part of the problem was his weight. (*Id.*). Fourth, Johnson experienced continued problems with his right shoulder, despite the manipulation surgery and sustained therapeutic exercise regimen. (*Id.*). Fifth, Johnson complained of shortness of breath, which Dr. Kaiser attributed to "a conditioning issue." (*Id.*). Sixth, Dr. Kaiser noted that Johnson had "an early Dupuytren's contracture on the plan of his right hand." (*Id.*). Finally, Johnson explained that he was trying to retire and brought disability forms from his attorney, John H. Burns ("Burns"); Burns sent Dr. Kaiser the same material. (*Id.*). Dr. Kaiser believed Johnson was trying to retire due to his orthopedic issues. (*Id.*). Although Johnson and Burns requested that he fill out the forms, Dr. Kaiser was not able to swear with any specificity to the questions because he and Johnson had "just gotten introduced over the last couple of months" and he was

17

"not familiar with [Johnson's] difficulties with his knees/hips." (*Id.*).  Dr. Kaiser suggested that physical therapy assess Johnson, provided an orthopedic consult, and asked Dr. Sampson to recheck Johnson's shoulder and assess his hips and knees.  (*Id.*).

Two weeks later, Johnson saw Dr. Sampson complaining of problems with his left hip and bilateral knee pain.  (*Id.* at 536).  Dr. Sampson noted Johnson had "problems with chronic obesity" and that he had difficulty getting out of a chair.  (*Id.*).  He also found that Johnson walked "reasonably well" without antalgia[28] in his gait, but noted weakness in Johnson's quads and tenderness in his upper leg and hip area, consistent with trochanteric bursitis.[29]  (*Id.*).  Dr. Sampson concluded Johnson's hip and knee pain was due to the fact he was overweight and deconditioned.  (*Id.*).  Dr. Sampson spoke with Johnson about conditioning, ordered a non-steroidal anti-inflammatory, and offered to order therapy. (*Id.*).

On May 18, 2009, Johnson returned to Dr. Kaiser concerned about a wound on the upper thigh of his right leg, where he gave himself insulin injections frequently.  (*Id.* at 537–39, 540).  The sore changed dramatically from the "area of redness" or "several millimeter superficial lesion" on Johnson's last visit into a deep ulcer now approximately 2 to 2.4 centimeters in diameter and with some purulency.[30]  (*Id.* at 533, 540).  Dr. Kaiser suspected Johnson did not finish his antibiotics because he still had some of the medication.  (*Id.* at 540).  The following day, Johnson saw Nancy Drange, R.N. ("Drange") at the wound clinic.  (*Id.* at 537–39).  During the limited physical assessment performed by Drange, Johnson had no complaints of chest pain

---

[28]     An antalgic gait is a form of gait abnormality in which the stance phase of gait is shortened relative to the swing phase and is a good indication of pain with weight bearing. *Stedman's Medical Dictionary*, Antalgic Gait, (27th Ed. 2000).

[29]     Trochanteric bursitis is inflammation of the bursa that provides a cushion between the bones, tendons, and muscles around the hip area. *Stedman's Medical Dictionary*, Trochanteric Bursitis, (27th Ed. 2000).

[30]     Purulency is the condition of containing or forming pus. *Stedman's Medical Dictionary*, Purulence (27th Ed. 2000).

or shortness of breath, but rated the wound pain at a four on a zero-to-ten scale.  (*Id.* at 537–39).

Drange found Johnson's functional assessment to be "independent, self."  (*Id.*).  A wound culture

revealed a bacterial infection.  (*Id.* at 537–39, 541).  One week later, Drange saw Johnson again

and noted his pain rating was down to zero to two out of ten.  (*Id.* at 537–39).  A week after that,

the wound was better and Johnson rated his pain at a zero.  (*Id.* at 543, 544–45).  Johnson saw

Drange three more times before the wound healed in August.  (*Id.* at 546, 553, 553).

On May 26, 2009 Johnson had physical therapy with Ryan Hebrink ("Hebrink") to

improve his general strength and condition.  (*Id.* at 542).  At that time, he felt he was not making

much improvement and felt "very exhausted."[31]  (*Id.*).  He admitted limited activity, infrequent

exercise, and only occasionally walking on his home treadmill at home at 2.5 MPH for

approximately five minutes.  (*Id.*).  Hebrink found that Johnson showed some improvement

because he was able to increase his reps and height with step-up exercises.  (*Id.*).  Johnson's

physical therapy sessions were increased from two to three times per week because Hebrink

concluded Johnson "would benefit even further" from the additional session.  (*Id.*).

Johnson cancelled his physical therapy appointment on June 24, 2009 because he was not

feeling well after doing some outdoor work.  (*Id.* at 549).  He returned two days later and

reported planning a diabetes check-up appointment.  (*Id.*).  Johnson complained that he felt

"somewhat fatigued" and troubled by his asthma.  (*Id.*).  Hebrink cut the session short because of

Johnson's complaints of fatigue and dizziness.  (*Id.*).  Johnson returned to physical therapy on

June 29 and again complained of fatigue and dizziness.  (*Id.* at 550).  At one point, Johnson

became lightheaded, dizzy, and pale; he sat down to rest, drank some orange juice, and then

---

[31]     The Administrative Record does not contain medical records from Johnson's previous physical therapy to improve his general strength and condition.  Nevertheless, it seems this was not Johnson's first appointment for that purpose based on the his subjective report that he was not improving and Hebrink's objective report that he was "showing improvement"  (*Id.* at 542).

continued to exercise. (*Id.*). Following the exercises, Johnson reported feeling fatigued, but "felt fine leaving." (*Id.*).

On July 14, 2009, Johnson saw Dr. Kaiser to follow up on his diabetes. (*Id.* at 551). Johnson reported one recent hypoglycemic episode and that a wound on his leg from insulin injections was healing. (*Id.*). Johnson explained he was not physically very active at work, but he was working and was "on his feet throughout the day" outside. (*Id.*). Dr. Kaiser repeated the need to start exercising and trying to lose weight. (*Id.*).

On September 14, 2009, Dr. Kaiser performed a pulmonary function test that revealed a mild restrictive ventilatory defect and suggested the possibility of a superimposed early obstructive pulmonary impairment. (*Id.*at 570). One week later, Johnson saw Dr. Daniel K. Tiede ("Dr. Tiede") for a two-day pharmacologic myocardial perfusion scan.[32] (*Id.* at 558). An electrocardiogram ("EKG") revealed appropriate responses in Johnson's heart rate and blood pressure both resting and responding to exercise. (*Id.*). Perfusion images revealed a mild hypoperfusion of the inferior wall on the rest images and a severe hypoperfusion to absent hypoperfusion to the distal inferior wall on the stress images.[33] (*Id.*). Dr. Tiede found these results were consistent with a possible nontransmural inferior wall myocardial infarction with significant ischemia adjacent to that area.[34] (*Id.*). The remaining segments of the left ventricle

---

[32]    A pharmacologic myocardial perfusion scan is an imaging procedure used to determine if there are areas of the heart that do not receive enough blood either at rest or during stress. Myocardial Perfusion Scan, Stress, Johns Hopkins Medicine http://www.hopkinsmedicine.org /healthlibrary/test_procedures/cardiovascular/myocardial_perfusion_scan_stress_92,P07979/ (last visited June 5, 2012).

[33]    Hypoperfusion is decreased blood flow to an organ. *Stedman's Medical Dictionary*, Perfusion (27th Ed. 2000).

[34]    A nontransmural myocardial infarction is the necrosis of heart muscle that does not extend from the innermost portion of the heart to outermost layer of heart tissue. *Stedman's Medical Dictionary*, Nontransmural Wall Myocardial Infarction (27th Ed. 2000).

had normal perfusion on both resting and stress images.  (*Id.*).  Further testing showed mild, generalized, diminished or slow movement of the walls of his heart and left ventricular ejection fraction calculated at 50%.  (*Id.*).

On September 24, 2009, Johnson saw cardiologist Dr. Jamie M. Pelzel ("Dr. Pelzel"). (*Id.* at 567).  He complained of "chronic shortness of breath ever since his bypass surgery in 1998."  (*Id.*).  Dr. Pelzel noted he had progressive exertional dyspnea and was able to walk only 175 feet to his mailbox before having to lean against something to rest.  (*Id.*).  Johnson complained that these symptoms were becoming worse.  (*Id.*).  Dr. Pelzel opined that Johnson's near-fainting episodes seemed to be related to low blood sugar.  (*Id.*).  He also noted that Johnson had chronic lower extremity.  (*Id.*).   Based on his examination, Dr. Pelzel concluded Johnson's symptoms were "likely multifactorial and related to underlying lung disease, his morbid obesity, deconditioning, and probable obstructive coronary artery disease."  (*Id.* at 568). Johnson demonstrated an interest in pursuing aggressive care, despite the fact that he understood that correcting his myocardial ischemia may not resolve his symptoms completely.  (*Id.*).  Dr. Pelzel recommended an invasive coronary angiogram to define Johnson's coronary anatomy and determine if heart surgery was appropriate.  (*Id.*).

On October 5, 2009, Dr. Pelzel performed an elective outpatient coronary angiogram. (*Id.* at 560–61).  The angiogram showed high-grade stenosis of Johnson's mid-left anterior descending coronary artery ("LAD") with a patent left internal mammary artery to the distal LAD.  (*Id.* at 560, 564).  Johnson's right coronary artery had only moderate disease and his right coronary artery vein graft was occluded likely as a result of competitive flow.  (*Id.* at 560).   Dr. Pelzel also noted chronic occlusions in other areas.  (*Id.*).   He concluded that a surgical procedure was not appropriate and recommended medical management.  (*Id.* at 564).  Dr. Pelzel

suggested that there were multiple potential etiologies for Johnson's extertional dyspnea, one of which was coronary artery disease. (*Id.* at 560). Dr. Pelzel also noted Johnson's sleep apnea, morbid obesity, and exercise-induced asthma. (*Id.*). Finally, he recommended that Johnson "could be seen back in follow up as needed." (*Id.*). Johnson requested an evaluation for disability, but Dr. Pelzel again noted that Johnson's inability to perform physical activity was likely multifactorial and his coronary artery disease was "really only one component." (*Id.*). Dr. Pelzel suggested that an occupational medicine disability specialist would be in the best position to evaluate Johnson. (*Id.*).

In a letter dated December 24, 2009, Dr. Kaiser responded to a request for his opinion regarding Johnson's medical issues and his ability to be a full-time carpenter. (*Id.* at 576). He opined that Johnson "would be unable to perform the physically demanding duties of a full-time carpenter." (*Id.*). Specifically, Dr. Kaiser stated that Johnson would not be able to carry weights of up to fifty pounds throughout an eight-hour workday. (*Id.*). He believed Johnson would fatigue "rather quickly" and not be able to perform the duties. (*Id.*). Dr. Kaiser could not be specific regarding Johnson's actual limitations because his limitations were multifactorial. (*Id.*).

### 3.     State Agency Medical Consultants' Opinions

Dr. Gregory H. Salmi ("Dr. Salmi") reviewed Johnson's medical records and assessed his impairments and functioning on January 24, 2008. (*Id.* at 411–413, 414–21). Dr. Salmi completed a Physical RFC Assessment based on his findings and concluded Johnson was capable of medium work with the following additional limitations: occasional climbing of ladders, ropes, and scaffolds; occasional crawling; and occasional overhead reaching with right arm. (*Id.* at 414–21). The primary diagnosis identified was shoulder pain and a secondary diagnosis of post-coronary artery bypass graft and partial lung resection were noted. (*Id.* at 414).

Dr. Salmi listed obesity another alleged impairment.  (*Id.*).  Dr. Salmi noted that the results of a July 2007 MRI of Johnson's shoulder were within normal limits and that he had manipulation procedure performed on the shoulder in October 2007 for adhesive capsulitis.  (*Id.* at 415).

On June 20, 2008, Dr. Aaron Mark ("Dr. Mark") reviewed Johnson's file and Dr. Salmi's assessment on reconsideration.  (*Id.* at 443–45).  Dr. Mark considered the following allegations: (1) diabetes, (2) heart disease, (3) asthma, (4) hip problems, (5) knee problems, (6) shoulder problems, (7) lung disease, (8) skin disease, and (9) cracked tailbone.  (*Id.* at 443).  Dr. Mark noted Johnson's file contained updated information on reconsideration, but there was "[n]o indication of a significant change in condition which would alter [the] initial assessment."  (*Id.* at 444).  Dr. Mark affirmed Dr. Salmi's assessment as it was written.  (*Id.*).  In doing so, Dr. Mark agreed implicitly with the medium RFC Dr. Salmi assigned to Johnson.  (*Id.*).

## D.    Evidence from the Vocational Expert

Wayne Onken ("Onken") testified as a vocational expert ("VE") at the hearing before the ALJ.  (*Id.* at 61–64).  Onken has an M.S. in Psychology/Vocational Rehabilitation Counseling from Saint Could State University.  (*Id.* at 107).  He is a certified rehabilitation counselor.  (*Id.*).

The ALJ asked Onken to consider the working ability of a hypothetical man between 58 and 61 years of age who was limited to medium work activities because of the following impairments: (1) a history of coronary artery disease, (2) a post bypass graphing and partial lung resection status, (3) a diagnosis of diabetes mellitus, (4) treatment for degenerative joint disease of the shoulders and left hip, (5) diagnosis of morbid obesity, (6) hyperlipidemia, (7) hypertension, (8) history of asthma, and (9) sleep apnea.  (*Id.* at 61–62).  Further, this hypothetical man would be limited to frequent climbing of stairs or ramps; occasional climbing

of ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, and crouching; and occasional crawling and overhead reaching with right arm.  (*Id.* at 62).

Onken testified that the hypothetical man would be capable of performing Johnson's past light job work as a contractor (D.O.T. 182.176-010), however, Johnson's past work experience in carpentry would be considered under a different job title for carpenters (D.O.T. 860.381-022). (*Id.* at 62).  Although carpentry is classified as a medium position, Onken noted Johnson testified that he performed the job at a heavy level, lifting up to at least one hundred pounds.  (*Id.*).  He concluded that both the carpenter and the contractor would fit into the medium hypothetical according to the D.O.T. descriptions, but not as they were performed.  (*Id.* at 62–63).

The ALJ then posed a second hypothetical of a man limited to light work, but all other conditions of the first hypothetical remained the same.  (*Id.* at 63).  Onken asserted that such a man would not be capable of performing the carpenter job, but could perform the contractor work.  (*Id.*).  Finally, the ALJ created a third hypothetical where the man was limited to sedentary work and only occasional overhead reaching with the right.  (*Id.*).  Onken concluded that none of the hypothetical man's past work would transfer to jobs at the sedentary level; the hypothetical man would not be able to perform past work of either a carpenter or a contractor. (*Id.* at 63–64).

### E.     The ALJ's Decision

On February 22, 2010, the ALJ issued an unfavorable decision.  (*Id.* at 13–19).  In finding that Johnson was not disabled, the ALJ employed the required five-step evaluation considering: (1) whether Johnson was engaged in substantial gainful activity; (2) whether Johnson had severe impairments; (3) whether Johnson's impairments met or equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) whether Johnson was

capable of returning to past work; and (5) whether Johnson could do other work existing in significant numbers in the regional or national economy. *See* 20 C.F.R. § 416.920(a)–(f).

At the first step of the evaluation, the ALJ found that Johnson had not engaged in substantial gainful activity since July 23, 2007. (*Id.* at 15). At the second step, the ALJ found Johnson had the following severe impairments: (1) a history of partial lung resection, (2) type II diabetes mellitus, (3) tendinopathy of the right shoulder, (4) hyperlipidemia, (5) morbid obesity, (6) hypertension, (7) coronary artery disease, (8) degenerative joint disease of the hip, and (9) lower extremity edema. (*Id.* at 16). The ALJ also noted that the following conditions were not severe impairments because they did not present "even minimal limitations to the claimant": asthma, benign positional vertigo, sleep apnea, bilateral degenerative disease of the shoulders, leg rash, bilateral knee pain, and "any mental impairments." (*Id.*).

At step three, consistent with the opinions of the State Agency Medical Consultants, the ALJ determined Wong did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525–1526, 416.920(d), 416.925–926). (*Id.*). Specifically, the ALJ found that even when considered together, none of Johnson's alleged musculoskeletal, respiratory, or cardiovascular impairments met or equaled any Listings in Sections 1.00Q, 3.00I, and 4.00F. (*Id.*). The ALJ also noted that he considered the effect of Johnson's obesity in evaluating Johnson's impairments. (*Id.*).

At Step Four of the evaluation, the ALJ was required to consider Johnson's subjective complaints as well as objective medical evidence. (*Id.* at 17–18). First, the ALJ found that though Johnson's physical impairments could be expected to cause his alleged symptoms, his statements regarding the persistence, intensity, and the limiting effects of those symptoms were

unsubstantiated by objective medical findings and, therefore, not credible to the extent that they were not consistent with a light RFC.  (*Id.*).  Second, the ALJ found that Johnson's "level of activity [was] inconsistent with [his] allegation of disability."  (*Id.*).

The ALJ gave significant weight to the opinions of the state agency medical consultants because their medium RFC assessments were "consistent with the evidence as a whole."  (*Id.* at 17).  The ALJ also gave great weight to the opinion of Johnson's treating doctors, Drs. Sampson and Kaiser.  (*Id.*).  He reasoned that the light RFC determination was consistent with medical records from Dr. Sampson stating that Johnson could use his shoulder, "but with some limitations," and Dr. Kaiser's statement that Johnson was "unable to perform the work of a carpenter." (*Id.*).  These opinions and medical records led the ALJ to conclude that Johnson was able to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b).  (*Id.*).  Giving further credence to the opinions and medical records, the ALJ imposed the following additional restrictions on Johnson's RFC: he can climb ladders, ropes, and scaffolds only occasionally; balance, stoop, kneel, and crouch frequently; crawl occasionally; and reach overhead with his right arm only occasionally. (*Id.*).

The ALJ also considered the course of Johnson's medical treatment and his use of prescription medication.  (*Id.* at 18).  He noted that Johnson failed to show for medical appointments and concluded that this evidence suggested that Johnson's impairments were "not as limiting as he alleges them to be."  (*Id.*).  Furthermore, the ALJ found Johnson's medical record did not suggest that he failed to receive significant relief of his symptoms with the use of medication. (*Id.*).

In addition to examining Johnson's physical impairments, the ALJ considered Johnson's credibility.  First, the ALJ determined that Johnson's daily living activities did not comport with

a finding that he could not perform gainful activity.  (*Id.* at 17).   The ALJ emphasized his level of functioning and found he was "fairly active."  (*Id.*).  He summarized Johnson's daily routine and noted that he can attend to personal grooming, prepare meals, wash dishes, perform prescribed exercise and therapy, read, watch television, shop two to three times per week, and care for his dog and thirty fish.  (*Id.*).  The ALJ also noted inconsistencies in the medical records, suggesting Johnson remained employed after the alleged onset date.  (*Id.* at 18).  Finding these records incompatible with Johnson's testimony that he had not worked since July 2007, the ALJ noted that Johnson had not reported earnings in 1987, 1989, and after 2005 and opined that "[t]his evidence suggests that the claimant has stayed out of the work force in the past for reasons unrelated to his impairments."  (*Id.*).   Ultimately, the ALJ concluded that (1) the objective medical evidence and treatment record was inconsistent with either impairments of such severity or symptoms of any intensity, persistency, or limiting effects that would require greater RFC reductions; (2) the medical records were inconsistent with a conclusion of disability; and (3) Johnson's activities of daily living, independent self-care, treatment, work history, and other factors did not support the need for further RFC considerations.  (*Id.*).

At Step Five, the ALJ determined Johnson was capable of performing past work as a contractor and a carpenter as they are generally performed in the national economy, but not as Johnson performed them previously.  (*Id.*).  The ALJ noted that this work did not require the performance of work-related activities precluded by Johnson's light RFC.  (*Id.*).  Accordingly, the ALJ concluded that Johnson was not disabled from July 23, 2007 (alleged onset of Johnson's disability) to February 22, 2010 (date of the ALJ's written decision) as defined in 20 C.F.R. § 404.1520(f) and 416.920(f).  (*Id.* at 19).

## II.     STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d 725, 727 (8th Cir. 1992). "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id.*

### A.          Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic.  20 C.F.R. §§ 404.967–.982, 416.1467.  If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court.  An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

### B.        Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. § 405(g).  This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by substantial evidence in the record as a whole."  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) (citation and internal quotation marks omitted)).  A court's task is limited to reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence."  *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision."  *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).  Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000).  Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'"  *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion."  "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis.  In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors:  (1) the ALJ's findings regarding credibility; (2) the claimant's education, background, work history, and age; (3) the medical evidence provided by the claimant's treating and consulting physicians; (4) the

claimant's subjective complaints of pain and description of physical activity and impairment; (5) third parties' corroboration of the claimant's physical impairment; and (6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980). Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

## III.   DISCUSSION

Johnson alleges the ALJ committed five errors: (1) erroneously determined that eight of his impairments were non-severe  (Pl.'s Mem. at 2–4); (2) failed to assess the severity of many of his alleged impairments (*Id.* at 4); (3) failed to adequately develop the record (*Id.* at 5–7); (4) fundamentally misstated the VE's testimony (*Id.* at 7–8); and (5) improperly discounted Johnson's credibility and consequently "ignored" his testimony regarding his ability to perform past relevant work.  (*Id.* at 8–9).

### A.  Severity of Johnson's Impairments

At Step Two of the Five-Step Sequential Process, the ALJ must consider whether a claimant "has a medically severe impairment that meets the duration requirement."  *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir. 2006).  An impairment is severe if it significantly limits one's physical or mental ability to perform basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If an impairment has no more than a minimal effect on the claimant's ability to work, it is non-severe.  *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007); SSR 96-3p, 1996 WL 374181 (Soc. Sec. Admin., July 2, 1996); *see also* 20 C.F.R. §§ 404.1521(a), 416.921.

The claimant bears the burden of proving that he has a severe impairment.  42 U.S.C. § 423(d)(1)(A); *Nguyen v. Chater*, 75 F.3d 429, 430–31 (8th Cir. 1996); 20 C.F.R. §§ 404.1520(c), 416.912.  If the claimant fails to establish a severe impairment, the analysis ends at Step Two; if the claimant can prove a severe impairment, the analysis proceeds to the next step and the ALJ must take into account all of the impairments, both severe and non-severe, in determining the appropriate RFC.  *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000); 20 C.F.R. §§ 404.1520(c); 404.1523; 404.1545(a)(2); 416.920; 416.923; 416.945(a)(2).

### 1.  Waiver of Johnson's Arguments at Step Two

Johnson fails to provide a meaningful explanation of his allegations that the ALJ erred at Step Two.  In support of his claim that the ALJ improperly determined the severity of eight of his impairments, Johnson merely states that the combined effect of these impairments is "[o]bviously . . . likely to reduce [his] work capacity."  (*Id.* at 4).  Similarly, regarding his claim that the ALJ erred by failing to consider the severity of some of his impairments, Johnson simply asserts that it is "obvious" that these impairments "substantially reduce his ability to do physical work on a full-time, competitive basis."  (*Id.* at 3, 4).

Johnson does not provide any description as to how his conditions limit his ability to do basic work activity.  He does not even provide a complete list of those impairments that the ALJ allegedly "simply ignored."  (*Id.* at 2).  Nor does he specify which listing or listings he believes he meets or equals.  Johnson's failure to develop these arguments results in a waiver.  *See Ollila v. Astrue*, No. 09cv3394 (JNE/AJB), 2011 WL 589037, at *11 (Jan. 13. 2011) (citing several cases finding an argument waived where a party fails to frame and develop an issue).  Despite this waiver, the Court conducted an extensive review of the record and rejects Johnson's arguments on the merits for the reasons provided below.

### 2.  Impairments the ALJ Found to Be Non-Severe

The ALJ concluded the following alleged impairments were non-severe: (1) asthma; (2) sleep apnea; (3) situational anxiety; (4) depression; (5) history of vertigo, described as benign positional vertigo; (6) leg rash; (7) bilateral degenerative joint disease of the shoulders; and (8). bilateral knee pain.  (Admin. R. at 16).  Although mentioned in the medical record, these conditions do not appear to have affected Johnson's physical or mental abilities in any significant manner.  Indeed, record references to each of these alleged impairments support the ALJ's conclusion that none of them places a significant limitation on Johnson's ability to perform basic work activities.

First, Johnson never received significant medical intervention to treat his asthma, sleep apnea, situational anxiety, or depression.  There is scant mention of asthma-related complaints and no mention of any functional limitation Johnson's asthma caused.  In the most recent record of Johnson's visit to a doctor regarding his asthma in November 2008, Dr. Kaiser noted that he had "very mild, intermittent" asthma and that Advair helped significantly.  (*Id.* at 458). Similarly, Dr. Pelzel noted in October 2009 that Johnson had obstructive sleep apnea, but it was

not being aggressively treated.  (*Id.* at 560).  Additional reports reflect Johnson's inconsistent use of a CPAP mask to ameliorate his sleep apnea and one notation states that he does not use the mask.  (*Id.* at 285, 493–94, 525–26).  Finally, although Johnson complained of depression and situational anxiety, he never sought the care of a psychiatrist, psychologist, or any other mental health care provider.  He alleged in April 2008 that he was "feeling depressed" because his conditions prevented him from engaging in some of his hobbies, but he was "trying to cope." (*Id.* at 177).  In August 2008, Johnson was placed on Zoloft after a break-in and assault at his home.  (*Id.* at 460).  Five months later, Johnson explained he felt he was "over any issues he [had] with that" and, at his request, he was weaned off Zoloft.  (*Id.* at 457).  There is no subsequent mention of depression, anxiety or any other mental health issues in the record.

Next, although Johnson sought medical care for his vertigo and leg rash, both conditions resolved quickly and long before the hearing date.  No record evidence exists that either condition limited significantly his ability to do basic work activities.  When Johnson first complained of vertigo in March 2004, Dr. Hund opined that the episodes were so short-lived that medication was unnecessary.  (*Id.* at 491).  Johnson's vertigo returned in July 2004.  (*Id.* at 490). In August 2004, Dr. Sahni concluded benign positional vertigo caused Johnson's symptoms.  (*Id.* at 504–05).  There is no record of a complaint regarding Johnson's benign positional vertigo in the record following that diagnosis.  (*Id.* at 447, 549, 550).  The only complaints of vertigo or dizziness after Dr. Sahni's diagnosis are attributed to the assault he sustained in July 2008 and fluctuations in blood sugar due to his diabetes.  (*Id.* at 447, 549, 550).  Johnson was treated in 2006 and 2007 for a leg rash.  (*Id.* at 227, 317–18, 379, 482–83, 497, 498, 499–500).  In April 2006, Dr. Schultz prescribed a topical treatment, an allergy medication, and a medicated wash. (*Id.* at 499–500).  The rash on Johnson's legs improved within six days; there was "no active itch

or rashiness component." (*Id.* at 498). Johnson followed up with Dr. Schultz seventeen months later to have his prescriptions refilled and she suggested annual check-ups. (*Id.* at 227, 379, 497). After that appointment, there is no record that Johnson returned to Dr. Schultz or any other care provider regarding his leg rash. Thus, the record supports the ALJ's determination that these impairments are not severe.

Also, the record belies Johnson's alleged impairment of bilateral degenerative joint disease of the shoulders. In August 2007, Dr. Zempel found that an MRI of right shoulder revealed a "little tendinopathy . . . [,] but no particular problem other than a little mild AC joint degenerative change." (*Id.* at 278, 307–08). Johnson told Dr. Zempel that he had a problem with his left shoulder three years prior that he believed was similar and he had "fairly good resolution" of that problem with therapy and chiropractic treatments. (*Id.*). Three months later, another MRI failed to reveal significant changes to his right shoulder. (*Id.* at 434). No other evidence of a diagnosis or treatment for degenerative joint disease in either of Johnson's shoulders exists.

Finally, Johnson argues that the ALJ erroneously concluded his bilateral knee pain was a non-severe impairment. There is a difference, however, between a medically determinable impairment and the symptoms that impairment produces. *See* 20 C.F.R. § 404.1529(b) (explaining that symptoms will not be found to affect the claimant's ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment is present). An "impairment" must result from an anatomical, physiological, or psychological abnormality that medically acceptable clinical and laboratory diagnostic techniques shows or establishes. SSR 96-4, 1996 WL 362210 (Soc. Sec. Admin., July 2, 1996).

Knee pain is a symptom, not a medically determinable impairment. Accordingly, the ALJ properly excluded it from the list of Johnson's severe impairments.

The record provides sufficient evidence that these impairments caused minimal limitation, if any, on Johnson's ability to perform basic work activities. Thus, the ALJ properly found that each of these conditions amounted to nothing more than non-severe impairments. Therefore, the ALJ did not err by concluding these impairments were not severe.

### 3. Impairments the ALJ Did Not Consider

Next, Johnson argues that the ALJ failed to consider the severity of some of his impairments, including: (1) progressive exertional dyspnea, (2) congestive heart failure, (3) heart wall ischemia secondary to previous myocardial infarction, (4) restrictive ventilatory defect, (5) stenosis of the coronary arteries; (6) lower extremity edema; (7) history of peptic ulcers with occasional melena; (8) early Dupytren's contracture in Johnson's right hand; and (9) adhesive capsulitis in his right shoulder. (Pl.'s Mem. at 2–4). These impairments allegedly limit Johnson's ability to perform work functions in ways unaccounted for in his RFC. Although Johnson waived arguments related to these impairments because he failed to develop them in his brief, the ALJ's determinations were proper. Moreover, any error at this step was harmless.

#### a) History of Peptic Ulcers with Occasional Melena, Edema, Early Dupytren's Contracture of Right Hand, and Adhesive Capsulitis in Right Shoulder

Johnson failed to provide any argument as to these impairments; he merely notes the diagnoses.[35] (*Id.* at 3). Although Johnson's discussion of the remaining impairments related to

---

[35] The entirety of Johnson's argument with respect to these impairments is as follows:

On examination, Dr. Pelzel diagnosed 2+ pitting edema in the Plaintiff's lower extremity and 1+ pitting edema in the right lower extremity. Tr. 568[.] He also noted that he has a history of peptic ulcers with occasional melena. Tr. 569[.]

this argument is fatally insufficient, he provides a basis for their consideration by summarily referring to the medical record for those conditions.  Because Johnson cited simply to these diagnoses and failed to explain how the limitations impair his ability to perform basic work functions, the Court will not address these conditions.

> **b)   Congestive Heart Failure, Stenosis of the Coronary Arteries, and Heart Wall Ischemia**

These conditions are not distinct impairments.  Rather, they are either causes or consequences of Johnson's coronary artery disease, an impairment that the ALJ concluded was severe.  Thus, Johnson's RFC accounted for any limitation these conditions imposed on his ability to perform basic work activities and it was not necessary for the ALJ to consider these conditions separately.  (*Id.* at 16); *see* 42 U.S.C. § 423(d)(3) (defining "physical or mental impairment").

Coronary artery disease is caused by a process called atherosclerosis, where the arteries that supply blood to the heart narrow due to a buildup of fatty deposits.  Heart Failure, Mayo Clinic (Dec. 23, 2011), http://www.mayoclinic.com/health/heart-failure/DS00061/DSECTION =causes; Myocardial Ischemia, Mayo Clinic (May 18, 2012), http://www.mayoclinic.com /health/myocardial-ischemia/DS01179/DSECTION=causes [hereinafter Myocardial Ischemia, Mayo Clinic].  Those fatty deposits may be stable or unstable.  Atherosclerosis, Merck Manual (Jan. 2008), *available at* http://www.merckmanuals.com/professional/cardiovascular_disorders /arteriosclerosis/atherosclerosis.html#v933668.  Stable fatty buildups may grow slowly over decades until they cause stenosis, which impairs blood flow to the arteries of the body and,

---

> Significantly, the ALJ ignored evidence that the Plaintiff has been diagnosed with early Dupyren's contracture in his right hand, and adhesive capsulitis in his right shoulder.

(Pl.'s Mem. at 3).

ultimately, causes congestive heart failure.   <u>Congestive Heart Failure</u>, Merck Manual (Jan.

2010),   *available   at*   http://www.merckmanuals.com/professional/cardiovascular

_disorders/heart_failure/heart_failure_hf.html [hereinafter <u>Congestive Heart Failure</u>, Merck

Manual].   Similarly, coronary artery disease may cause ischemia, a type of heart disease that

causes congestive heart failure.   *Stedman's Medical Dictionary*, Ischemia, (27th Ed. 2000);

<u>Myocardial Ischemia</u>, Mayo Clinic; <u>Congestive Heart Failure</u>, Merck Manual.   Thus, because

each of these conditions is related directly to coronary artery disease as either a cause or

consequence, the ALJ accounted for them in Johnson's RFC and was not required to consider

them as separate severe impairments.

### c)   Progressive Exertional Dyspnea

As with Johnson's bilateral knee pain, his progressive exertional dyspnea is a symptom of

his impairments, not a medically determinable impairment.   *See* 20 C.F.R. § 404.1529(b); SSR

96-4; *cf., e.g.*, *Polaski v. Heckler*, 606 F. Supp. 549, 550 (D. Minn. 1985) (noting that shortness

of breath, or dyspnea, is a symptom of an impairment).   Moreover, according to Dr. Pelzel, this

"symptom is likely multifactorial and related to underlying lung disease, [Johnson's] morbid

obesity, decondition, and probably obstructive coronary artery disease." (*Id.* at 568).   The ALJ

found Johnson's morbid obesity and coronary artery disease to be severe impairments. (*Id.* at

16).   He considered those impairments, as well as the other severe and non-severe impairments,

including asthma and partial lung resection, in determining Johnson's RFC. (*Id.* at 16).   In doing

so, he properly considered any effect Johnson's progressive exertional dyspnea had on his ability

to complete basic work activities.

### d)   Restrictive Ventilatory Defect

A restrictive ventilatory defect refers to a category of diseases that are characterized by a reduction in lung volume.  Airflow, Lung Volumes, and Flow-Volume Loop, Merck Manual, (May    2009)    http://www.merckmanuals.com/professional/pulmonary_disorders/tests_of _pulmonary_function_pft/airflow_lung_volumes_and_flow-volume_loop.html#v912807.    A restrictive ventilatory defect may be caused by many conditions, including partial lung resection and pulmonary sarcoidosis.  *Id.*  Which condition caused Johnson's restrictive ventilatory defect is not clear from the record.  Regardless of whether Johnson's partial lung resection or his pulmonary sarcoidosis caused his restrictive ventilatory defect, the ALJ's determination was correct.  If Johnson's history of partial lung resection is responsible for his restrictive ventilatory defect, the ALJ found that impairment was severe and accounted for any limitations it caused in his RFC.  (*Id.* at 16).  If Johnson's pulmonary sarcoidosis caused his restrictive ventilatory defect, the ALJ properly found that it was not severe.  In 2004, Dr. Kathawalla found that Johnson's pulmonary sarcoidosis had been stable for many years and any pulmonary nodules he had were tiny and also stable.  (*Id.* at 525–26).  In 2008, Dr. Kaiser noted simply that he had a remote history of pulmonary sarcoidosis.  (*Id.* at 458).  There is no other reference of sarcoidosis in the record to suggest that it imposed anything more than a minimal effect on Johnson's ability to work.

### 4.   Any Error in Determining Impairments Were Non-Severe or in the Failure to Consider the Severity of Impairments Was Harmless

The Eighth Circuit considered the effect of an error at Step Two in *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007).  There, Nicola was diagnosed with borderline intellectual functioning, but the ALJ did not consider it as a severe impairment at Step Two of the sequential analysis.  *Id.* at 887.  On appeal, the Commissioner conceded this failure was in error, but asserted harmless

error. *Id.* (relying on *Howard v. Massanari*, 255 F.3d 577, 581–82 (8th Cir. 2001)). In *Nicola*, the Eighth Circuit rejected the Commissioner's reliance on *Howard*. *Id.* The court explained that the issue in *Howard* was whether the hypothetical posed to the VE adequately addressed the limitations associated with the diagnosis of borderline intellectual functioning, not whether a claimant's diagnosis of borderline intellectual functioning was a severe impairment. *Id.* Citing *Hunt v. Massanari*, 250 F.3d 622, 625–26 (8th Cir. 2001), the court held a diagnosis of borderline intellectual functioning must be considered a severe impairment when sufficient medical evidence supports the diagnosis. *Id.* Accordingly, the court reversed and remanded the case, "reject[ing] the Commissioner's argument of harmless error." *Id.*

Several courts have interpreted *Nicola* to stand for the proposition that an error at Step Two can never be harmless. *See Moraine v. Soc. Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) (No. 08cv5982 JRT/RLE); *see also Stewart v. Astrue*, No. 09-3170-cv-s-JCE-SSA, 2011 WL 338794 (W.D. Mo. 2011 Jan. 31, 2011); *Lamorte v. Astrue*, No. 3:08cv03040, 2009 WL 3698004 (W.D. Ark. Nov. 2, 2009). This Court does not read *Nicola* to establish a rule of *per se* reversibility regarding an ALJ's error at Step Two for at least four reasons. First, such a presumptive rule overstates *Nicola*. *Nicola* explicitly relied on precedent that provides borderline intellectual function should be considered a severe impairment where there is a diagnosis and a medical record to support that diagnosis. 480 F.3d at 887. In doing so, the court limited its decision to the impairment of borderline intellectual functioning, an impairment that is not alleged here. Second, a broad interpretation of *Nicola* is inconsistent with the rule in the majority of other Circuits[36] and the deferential standard afforded to the Commissioner's

---

[36]     *Parker-Grose v. Astrue*, 462 Fed. App'x 16, 18 (2d Cir. 2012) (finding that where ALJ concluded mental impairment was nonsevere, but did not take the limitations imposed by that impairment into account in determining claimant's RFC was not harmless error); *Schettino v.*

determinations.  42 U.S.C. § 405(g) (stating that if "substantial evidence" supports the findings of the Commissioner, then those findings are conclusive).  Third, in *Caviness v. Massanari*, a case that predates *Nicola*, the Eighth Circuit suggested that an error at Step Two could be harmless in some circumstances.  250 F.3d 603, 605 (8th Cir. 2001).  There, the court found error where the ALJ held that Caviness had not established a severe impairment and concluded the sequential analysis at Step Two.  *Id.*  The court then reviewed the record, but could not "say the evidence was so clearly against [Caviness] that this error of law was harmless," and reversed and remanded the case.  *Id.* at 605–06.  Fourth and finally, other courts in this Circuit have rejected the broad reading of *Nicola* and held that an error at Step Two is not by itself reversible error where the ALJ continues with the evaluation in determining the claimant's RFC, considering all of the claimant's impairments.  *Greenemay v. Astrue*, No. 10-4254-cv-c-ods, 2011 WL 3876307, at *5 n.3 (W.D. Mo. Aug. 30, 2011) (rejecting explicitly a broad reading of *Nicola*); *Bondurant v. Astrue*, No. 09cv328 (ADM/AJB), 2010 WL 889932, at *2 (D. Minn. Mar. 8. 2010) (holding that any error at Step Two is harmless if the claimant establishes at least one severe impairment and the ALJ considers all impairments in the subsequent steps of the evaluation and citing several cases for the same proposition); *see also Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028–29 (D. Minn. 2010) (holding that the ALJ's failure to include adrenal insufficiency as a severe impairment was not reversible error because it would not have affected the ALJ's decision).  As Judge Ann D. Montgomery explained in *Bondurant v. Astrue*, any error

---

*Commissioner of Soc. Sec.*, 295 Fed. App'x 543, 546 n.4 (3d Cir. 2008) (holding that an ALJ's failure to Step Two to find an impairment severe is harmless where the ALJ continues with the sequential inquiry and consider the limitations imposed by the impairment); *Herrera v. Commissioner of Soc. Security*, 406 Fed. App'x 899, 903–04 (5th Cir. 2010) (same); *Nejat v. Commissioner of Soc. Sec.*, 359 Fed. App'x 574, 577 (6th Cir. 2009) (same); *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (same); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (same); *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008) (same); *Delia v. Commissioner of Soc. Sec.*, 433 Fed. App'x 885, 887 (11th Cir. 2011) (same).

at Step Two is harmless "because if Plaintiff makes a threshold showing of **any** 'severe' impairment, the ALJ continues with the sequential evaluation process and considers all impairments, **both severe and nonsevere**.'"   2010 WL 889932, at *2 (emphasis in original) (citations and quotations omitted) (overruling the claimant's objections and adopting the Report and Recommendation of Magistrate Judge Arthur J. Boylan).   Accordingly, the failure to find additional impairments at Step Two does not constitute reversible error when an ALJ considers all of a claimant's impairments in the remaining steps of a disability determination.   *Id.*; *see also Fisk v. Astrue*, 253 Fed. App'x 580, 583 (6th Cir. 2007) (quoting *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)) (finding the ALJ's error at Step Two was harmless where the ALJ continued the five-step evaluation and considered all impairments); *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1028 (D. Minn. 2010) (No. 09cv473 DWF/SRN) (citations omitted) (finding the ALJ's error at Step Two was not reversible error because the ALJ continued with the evaluation and considered all impairments).

Consistent with the principles outlined above, this Court finds that an error at Step Two may be harmless where the ALJ considers all of the claimant's impairments in the evaluation of the claimant's RFC.   Assuming *arguendo* that the ALJ erred in failing to find certain impairments severe and not evaluating the severity of other impairments, that error is harmless here.   The ALJ found that Johnson had some severe impairments, and he considered all of Johnson's impairments—severe and non-severe—in determining Johnson's RFC.   *See* 20 C.F.R. §§ 404.1523; 404.1545(a)(2); 416.923; 416.945(a)(2); *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000); SSR 96-8p, 1996 WL 374184 (Soc. Sec. Admin., July 2, 1996); SSR 85-28, 1985 WL 56856 (Soc. Sec. Admin., 1985).   Here, the ALJ asked the VE if a hypothetical man with the same impairments as Johnson, including

> a history of coronary artery disease and being status post bypass grafting and partial lung resection and diagnosis of diabetes mellitus and treatment for degenerative joint disease of the shoulders and the diagnosis of morbid obesity and hyperlipidemia and hypertension and coronary artery disease, a history of asthma and sleep apnea, a history of degenerative joint disease of the left hip

would be capable of performing Johnson's past work.  (*Id.* at 62).  The VE testified that such a hypothetical man could perform the work of a contractor.  (*Id.*).  The ALJ relied on this testimony in assessing Johnson's RFC.  (*Id.* at 18).  Thus, the ALJ considered all of Johnson's impairments—severe and nonsevere—throughout the five-step evaluation and any error was harmless.  Further, any error by the ALJ in failing to find Johnson's alleged impairments severe at Step Two is impertinent to his non-disability finding.  There is substantial evidence in the record that even considering the combined effects of all of Johnson's impairments and resulting limitations would not have resulted in a finding that Johnson was disabled.

## B.  The ALJ Adequately Developed the Record

Johnson argues that his RFC is not supported by evidence in the record as a whole because the ALJ failed to adequately develop the record with respect to (1) the RFC Assessments from the State Agency Consultants and (2) the medical records regarding Johnson's shoulder from Dr. Sampson.  The ALJ bears a "responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case."  *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004) (internal citation omitted).  Unless a critical issue is undeveloped, the ALJ is not required to obtain additional or clarifying statements.  *See Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005).  Generally, the claimant's failure to provide information as to Step Four, where the claimant bears the burden of proof, "should not be held against the ALJ when there **is** evidence that supports the ALJ's decision."  *Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (emphasis in original).  Put another way, "an ALJ is permitted to issue a decision without

obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999) (citation and internal quotation marks omitted).

### 1.    The ALJ Adequately Developed the Record with Respect to the State Agency Consultants

Johnson asserts that ALJ failed to adequately develop the record with respect to the RFC Assessments for two reasons.   First, he argues that Dr. Mark's RFC Assessment was nothing more than a "perfunctory" review of Dr. Salmi's decision and it was improper for the ALJ to rely on it.   (Pl.'s Mem. at 6).   Second, Johnson argues that the RFC Assessments were outdated because they were conducted two years before the hearing.   (*Id.* at 5–6).   Because the RFC Assessments from the State Agency Consultants are supported by sufficient evidence in the record, the ALJ had no duty to further develop the record.

First, Johnson's assertion that Dr. Mark's RFC Assessment was perfunctory fails for two reasons.   Johnson failed to provide any argument to support his bare assertions, and such a failure results in waiver of the argument.   *See Ollila*, 2011 WL 589037, at *11; *see also Vandenboom*, 421 F.3d at 750.   Johnson does not cite to the record or otherwise attempt to connect any of the facts of the case to his argument.   Curiously, the only discussion Johnson offers in support of his claim recognizes that Dr. Mark explicitly acknowledged "[u]pdated information in the file," and that he found "[n]o indication of a significant change which would alter [Dr. Salmi's] initial assessment."   (*Id.* at 6).   Inexplicably, Johnson also notes that Dr. Mark indicated that he "reviewed all of the evidence in the file."   (*Id.*).   Johnson's failure to develop this argument in any meaningful way, results in a waiver.

Even though Johnson's argument about Dr. Mark's review is waived, the argument also fails on its merits.  Johnson does not challenge Dr. Salmi's review of the medical record prior to January 24, 2008; therefore, only those items in the record that took place between Dr. Salmi's review and Dr. Mark's review could support Johnson's argument that Dr. Mark's review was deficient.  Only four items in the record occurred in the six months between the two RFC Assessments: (1) notes from a March 3, 2008 appointment with Dr. Kemp (Admin. R. at 430, 470); (2) a lab report following that appointment that reveals all of Johnson's levels fell within the proper range, except his A1C (*Id.* at 426–29); (3) a refill prescription for therapeutic shoes (*Id.* at 466); and (4) notes from a June 16, 2008 appointment with Dr. Kemp.  (*Id.* at 469). Neither appointment with Dr. Kemp resulted in a conclusion that Johnson was disabled or that his impairments imposed any further limitations than in the past.  (*Id.* at 430, 469, 470).  In the record from the June 2008 appointment, Dr. Kemp describes Johnson as a "[p]leasant man in no apparent distress," notes Johnson's eight-pound weight loss, and mentions that Johnson felt his tailbone was "improving."  (*Id.* at 469).  Accordingly, the medical record supports Dr. Mark's conclusion that there was not a significant change in Johnson's condition between his RFC Assessment and Dr. Salmi's RFC Assessment.  (*Id.*).  Thus, the ALJ's reliance on Dr. Mark's RFC Assessment was appropriate and there was no failure to supplement the record.

Second, the fact that the RFC Assessments were written two years before the hearing date does not in itself render them incapable of serving as substantial evidence on the record.  The regulations provide the following factors for determining the extent to which medical opinions should be given controlling weight: (1) the existence of an examining relationship; (2) the extent of a treatment relationship; (3) supportability based on medical evidence; (4) consistency with record as a whole; (5) specialization of the expert; and (6) other additional facts.  20 C.F.R. §

404.1527(c) (1)–(6).  Neither Dr. Salmi nor Dr. Mark had a treating relationship with Johnson, yet each doctor thoroughly examined Johnson's medical records up to the date of their review. (*Id.* at 411–13, 414–21, 443–45).  Though the RFC Assessments do not consider records from June 20, 2008 to January 4, 2010, they are consistent with the record as a whole prior to that period.  Most importantly, the conclusions reached in both RFC Assessments that Johnson was not disabled are consistent with subsequent medical records that reveal he continued to work. (*Id.* 501–03, 506–07, 537–39, 546–47, 567–69).  In addition, the ALJ did not wholly adopt the medium RFC determination both doctors recommended.  Rather, he considered the more recent medical records from Johnson's treating doctors, his work history, testimony, and daily activities in further limiting Johnson to a light RFC.  (*Id.* at 17–18).  Weighing these factors, the failure to obtain a more recent RFC Assessment did not constitute a failure to develop the record.

### 2. The ALJ Adequately Developed the Record with Respect to Dr. Sampson

Johnson also argues that the ALJ's reliance on Dr. Sampson's report from November 2007 was error because the record was more than two years old at the time of the hearing.  (Pl.'s Mem. at 6–7).  Essentially, Johnson argues that by failing to re-contact Dr. Sampson regarding Johnson's right arm, the ALJ failed to develop the record adequately.

An ALJ is not required to obtain additional medical evidence if the other evidence in the record provides a sufficient basis for the decision.  *See Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999) (citation omitted).  The relevant regulation states:

> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

20 C.F.R. § 404.1512(e)(1).   Prior to this passage, the regulation states that re-contacting is necessary "[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled."   20 C.F.R. § 404.1512(e).   The ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.  *Goff*, 421 F.3d at 791.

Dr. Sampson's assessment in November 2007 was based on the condition of Johnson's shoulder eight weeks after his shoulder manipulation surgery.  (Admin. R. at 439).  Dr. Sampson observed that Johnson still experienced some problems with his shoulder, but he concluded that Johnson was "making progress."  (*Id.* at 439).  He did not recommend aggressive treatment; instead, he encouraged Johnson to "take things at his own pace with his stretches" and formally discontinued therapy.  (*Id.* at 439).  The ALJ did not find Dr. Sampson's opinion ambiguous, inadequate, or incomplete, nor did he discount Dr. Sampson's opinion.  Rather, the ALJ gave Dr. Sampson's statements "great weight" and reasonably interpreted his statements to find that Johnson could use his right shoulder, but with some limitations.  (*Id.* at 17).   Moreover, subsequent medical records documenting Johnson's course of treatment with Drs. Sampson, Kemp, and Kaiser, and his physical therapy following the manipulation procedure to his right shoulder provide adequate objective medical evidence from which to determine any limiting effects Johnson's shoulder had on his RFC.[37]   The ALJ did not need to re-contact Dr. Sampson for additional information.

---

[37]   (*Id.* at 212, 213, 214, 216, 217, 218, 219, 220, 221, 223, 224, 225, 226, 228, 229, 230, 231–42, 249, 250, 251, 253, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370–71, 372, 373, 374, 377, 378, 380, 381, 383, 384–96, 402, 403, 404,  431, 432, 433, 434, 436–37, 439, 468, 471–72, 519, 520, 523, 524, 533–35).

3.      The Absence of an Updated Record from a State Agency
Consultant or Dr. Sampson Regarding Johnson's Shoulder
was Harmless Error

Assuming *arguendo* that the ALJ failed to adequately develop the record by not acquiring

a more current RFC Assessment from a State Agency Consultant and/or an updated record from

Dr. Sampson or another physician about Johnson's shoulder, any such error was harmless.  To

necessitate remand for failure to develop the record, a claimant must show prejudice or

unfairness.  *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir. 1993).  Prejudice is demonstrated

when a claimant presents evidence supporting the proposition that additional evidence would

have been favorable to a disability determination.  *See LaCroix v. Barnhart*, 465 F.3d 881, 886

(8th Cir. 2006) (citing *Onstad*, 999 F.2d at 1234).  Whether a claimant has or had a lawyer that

failed to attempt to obtain the relevant information is an additional relevant factor in determining

prejudice.  *See Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981).

Johnson did not show that Dr. Sampson or any other physician would have provided an

opinion supporting his contention that he cannot reach overhead with his right arm occasionally,

much less that he is totally disabled.  As noted above, any limiting effects Johnson's shoulder

caused were discernible from subsequent medical records from Dr. Sampson and other treatment

providers, and were provided for in his RFC.  Those records do not support an inference that any

hypothetical additional opinion would have supported Johnson's contention of disability.

Johnson cannot, therefore, show that he was prejudiced by the ALJ's failure to obtain a more

current RFC Assessment or to re-contact Dr. Sampson or another physician regarding his

shoulder.  Additionally, Johnson's attorney made no attempt to obtain an additional RFC

Assessment or further information from Dr. Sampson regarding Johnson's shoulder and did not

make such a request at the hearing or in his Memorandum in Support of Request for Appeals

Counsel Review of a Hearing Decision.  (*Id*. at 41–65, 204–06).  Based on these facts, the Court

cannot conclude that Johnson was prejudiced; remand is not warranted.

### C.  The ALJ's Misstatement of the VE's Testimony Was Harmless Error

At the hearing, the VE testified that an individual with Johnson's age, education, past

work experience, severe impairments, and light RFC **could not** perform Johnson's past work as a

carpenter, but could perform Johnson's past work as a contractor.[38]  (*Id*. at 63).  In his decision,

the ALJ stated that the VE found that such an individual **could** perform the past relevant work as

a carpenter.  (Pl.'s Mem. at 7).  The Commissioner concedes this conclusion was in error and

contrary to the VE's testimony.  (Def.'s Mem. at 17).  Nevertheless, the ALJ's error is harmless

because it is undisputed that the ALJ assessed Johnson at a light RFC and the VE testified that

Johnson could perform his past relevant work as a contractor as described in the D.O.T. as light

work.  (*Id*.).  *See Dewey v. Astrue*, 509 F.3d 447, 449–50 (8th Cir. 2007) (an error is harmless

when it would not affect the ALJ's decision).  Substantial evidence in the record supports the

ALJ's RFC assessment.  Even if the ALJ had properly recounted the VE's testimony, the record

would have compelled the same result.  Thus, the ALJ's error is harmless because a correction of

the ALJ's error does not affect the outcome of the RFC or its legitimacy.

---

[38]    At the hearing, it appears the ALJ began to answer his own inquiry regarding the
hypothetical man's ability and the VE agreed:

> ALJ: Okay, and if the hypothetical man instead of being limited to medium work
> were limited to light work, would everything else remain the same with the
> contractor?  The carpenter job would be out I take it because—
> VE: Yea.
> ALJ: —that's a medium for the DOT?
> VE: Yes.  That would be out.  Contractor according to the DOT would be a
> match.

(Tr. 63).

### D.  Johnson's Experience as a Contractor Constitutes Past Relevant Work

To be relevant, past work must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted substantial gainful activity.  20 C.F.R. § 404.1565(a); *Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000).  The regulations define substantial gainful activity as work activity that involves significant physical or mental activities and is done for pay or profit, even if no profit is realized.  *Reeder*, 214 F3d at 989 (citing 20 C.F.R. § 404.1572(a), (b)).  Johnson concedes that he worked as a contractor within the last fifteen years and does not dispute that he knew the job.  Nor does he dispute that contracting constitutes work done typically for pay or profit.  Nevertheless, Johnson argues that that the ALJ erred in considering his contractor experience as past relevant work because that work was not substantial, as it was merely a component of his true work as a carpenter.

The fact that Johnson worked as a contractor to support his carpentry business does not demand the conclusion that the contractor work was not substantial.  "Substantial" work includes part-time work, but not work that is only "off-and-on" or for brief periods.  *Reeder*, 214 F.3d at 989 (citation omitted); 20 C.F.R. §§ 404.1565(a), 404.1572(a).  Johnson testified that he worked eight to ten hours per day as a carpenter and one to two hours at night as a contractor.  (*Id.* at 56–57).  He was the sole contractor for his self-employed business for over thirty years.  His experience as a contractor is analogous to part-time work.  Thus, the ALJ correctly determined Johnson's experience as a contractor was substantial gainful activity and constituted past relevant work.

### E.  The ALJ's Credibility Analysis

Finally, Johnson contends that the ALJ "obviously ignored" his sworn testimony about his ability to perform past work.  (Pl.'s Mem. at 8–9).  In effect, he argues that the ALJ erred in discounting his credibility regarding the severity of his impairments.  Because substantial evidence supports the ALJ's analysis of Johnson's credibility, he was justified in discrediting Johnson's subjective complaints of pain and the resulting limitations.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), outlines the factors governing credibility determinations.  In assessing subjective complaints of pain, an ALJ must examine several factors:  "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."  *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322).  The claimant's work history and objective medical evidence are also relevant.  *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999).  "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility."  *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)).  An ALJ may discount subjective complaints if they are inconsistent with the evidence as a whole.  *Id.* (citing *Polaski*, 739 F.2d at 1322).  Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this Court defers to ALJs' decisions on credibility.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001).

The *Polaski* factors were applied properly when the ALJ determined Johnson's subjective complaints of plain were not credible.  With respect to the first *Polaski* factor, Johnson's daily activities, the ALJ noted that Johnson was able to care for his personal grooming, prepare meals,

shop, perform prescribed exercises and therapy, and complete household tasks such as washing dishes. (Admin. R. at 17–18). Similarly, Johnson's assertions regarding the intensity, persistence, and limiting effects of his alleged impairments were not consistent with the objective medical evidence and his course of treatment. (*Id*. at 18). Specifically, the ALJ cited Johnson's continued employment, activities and hobbies, and failure to appear for medical appointments as demonstrating that his impairments were not severely debilitating. (*Id*.). The ALJ also noted that the "evidence suggest[ed] that the claimant has stayed out of the work force in the past for reasons unrelated to his impairments. (*Id*.) *Tuttle v. Barnhart*, 130 Fed. App'x 60, 61 (8th Cir. 2005) ("evidence indicating a lack of motivation to work may be used as a credibility factor so long as it is not a dispositive one"); *Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (concluding that the plaintiff's lack of motivation to work was a reasonable basis to discredit the subjective complaints). The ALJ determined that Johnson's physical limitations were not credible to the extent they were inconsistent with a light RFC. (*Id*.).

Thus, the ALJ considered Johnson's subjective complaints regarding the severity of his impairments, but found independent reasons, supported by substantial evidence, to discredit those complaints. Because the ALJ considered Johnson's credibility and provided a thorough explanation for his reasons for disbelieving Johnson's subjective complaints, this Court will not disturb the ALJ's determination.

## IV.   RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Plaintiff Johnson's Motion for Summary Judgment [Doc. No. 11] be **DENIED**;

3.      Defendant Commissioner's Motion for Summary Judgment [Doc. No. 17] be

**GRANTED.**

Dated: July 11, 2012

                                                                      *s/ Steven E. Rau*
                                                             STEVEN E. RAU
                                                             United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing
with the Clerk of Court, and serving all parties by **July 25, 2012**, a writing which specifically
identifies those portions of this Report to which objections are made and the basis of those
objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting
party's right to seek review in the Court of Appeals.  A party may respond to the objecting
party's brief within ten days after service thereof.  A judge shall make a de novo determination
of those portions to which objection is made.  This Report and Recommendation does not
constitute an order or judgment of the District Court, and it is therefore not appealable to the
Court of Appeals.